**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

-------------------------------------------------------------------X

**PRINCESS MALCOLM,**

                                               **Civil Action No:**

                     **Plaintiff,**

                                               **COMPLAINT**

        **-against-**

**FLORIDA CAREER COLLEGE,**
**INTERNATIONAL EDUCATION CORPORATION,**
**IEC U.S. HOLDINGS, INC., and BROOKSHIRE**
**INTERNATIONAL ACADEMY,**

                          **Defendants.**

-------------------------------------------------------------------X

       **PLAINTIFF PRINCESS MALCOLM** (hereinafter referred to as "Plaintiff" or "Ms. Malcolm"), by her attorneys, Nesenoff & Miltenberg, LLP and Stephen E. Bailey, P.A., alleges upon knowledge with respect to herself, and upon knowledge, information and belief as to all other matters, as follows:

**THE PARTIES**

       1.      At all times relevant to this Complaint, Plaintiff was and is a resident and domiciliary of the State of Florida.

       2.      Upon information and belief, at all times relevant to this Complaint, Defendant Florida Career College (hereinafter "Defendant FCC") was and is an accredited vocational and trade school with a campus located at 989 North Semoran Boulevard, Orlando, Florida 32807.

       3.      Upon information and belief, at all times relevant to this Complaint, Defendant FCC is owned and controlled by Defendant IEC Holdings, Inc. (hereinafter "Defendant

Holdings"), which has a principal place of business located at 16485 Laguna Canyon Road, Suite 300, Irvine, California 92618.

4.       Upon information and belief, at all times relevant to this Complaint, Defendant International Education Corporation (hereinafter "Defendant IEC" and, together with Defendant FCC and Defendant Holdings, hereinafter sometimes the "College Defendants") was and is a national system of for-profit colleges, including Defendant FCC, incorporated in the State of Delaware with a principal location at 16485 Laguna Canyon Road, Suite 300, Irvine, California 92618.

5.       Upon information and belief, Defendant Holdings was and is a wholly-owned subsidiary of Defendant IEC.

6.       Upon information and belief, Defendant Brookshire International Academy (hereinafter "Defendant Brookshire" and, together with the College Defendants, hereinafter sometimes the "Collective Defendants") maintains a principal place of business located at 6926 Federal Boulevard, Lemon Grove, California 91945.

7.       Upon information and belief, Defendant Brookshire partners with vocational and trade schools to assist students in earning a high school diploma together with a specialized degree.

8.       Upon information and belief, Defendant Brookshire, at all times relevant, was and is partnered with the College Defendants.

9.       Upon information and belief, the Collective Defendants at all times relevant to this Complaint, each received and continue to receive federal funding and are therefore subject to liability under Title IX of the Education Acts of 1972, 20 U.S.C. § 1681(a) (hereinafter "Title IX").

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over Plaintiff's claims based on 28 U.S.C. §§ 1331 and 1332. This Court has supplemental jurisdiction over Plaintiff's state law claim pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form a part of the same case or controversy between Plaintiff and Collective Defendants.

11.      Venue is proper in this case pursuant to 28 U.S.C § 1391(b)(2) because a substantial part of the events which give rise to Plaintiff's claims took place in Orange County, Florida which is located in the Middle District of Florida.

## INTRODUCTION OF PLAINTIFF'S CLAIMS

12.     Ms. Malcolm, a former student of Defendant FCC, brings this action for damages against the Collective Defendants for violations of Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, *et seq.* ("Title IX") stemming from the Collective Defendants' gross mishandling and willful disregard of Plaintiff's report of sexual misconduct against her career advisor, and the Collective Defendants' intentional and malicious retaliation against Plaintiff for submitting a complaint of sexual misconduct against one of Defendant FCC's personnel.

13.     Specifically, while Ms. Malcolm was enrolled as a student at Defendant FCC, Rondric Davis ("Advisor Davis") abused his position of power as Plaintiff's advisor and subjected Ms. Malcolm to abhorrent sexually harassing behavior in exchange for his assistance with Plaintiff's career prospects. Advisor Davis' sexually harassing and controlling behavior towards Plaintiff was open and notorious; it happened in front of her colleagues and friends and was a near everyday occurrence.

14.     Eventually, Ms. Malcolm's friend and fellow student reported the sexual harassment to Defendant FCC on Plaintiff's behalf, leading to Plaintiff submitting her own formal

Title IX complaint to Defendant FCC's then-President. Following her formal complaint, Plaintiff was further victimized by Defendant FCC who, under the guise of protecting Plaintiff, stripped Plaintiff of valuable resources and professional aid thereby hindering her professional and academic opportunities. Ms. Malcolm was hopeful that it would all be worth it in the end and Advisor Davis would be held accountable for his actions but, sadly, the College Defendants ultimately found in favor of Advisor Davis and cleared him of any wrongdoing. Thereafter, the Collective Defendants acted in concert with one another to further attack Plaintiff in retaliation for her complaint against Advisor Davis.

15.     As a result of Collective Defendants' willful and wanton actions and/or inactions, Plaintiff has suffered tremendous emotional damages. In addition, Plaintiff has suffered further damages which include, but are not limited to, the loss of educational and career opportunities, and other direct and consequential damages.

<u>**CLAIM I – Violation of Title IX of the Education Amendments of 1972**</u>
<u>**Deliberate Indifference**</u>
<u>**As Against the College Defendants**</u>

16.     Plaintiff repeats and re-alleges paragraphs 1 through 9 and 12 through 15 as if fully set forth herein.

17.     Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

18.     Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding.

19.    Title IX applies to an entire school or institution if any part of that school receives federal funds even where there is very little direct federal funding of a particular department or academic and/or extracurricular area.

20.    The Collective Defendants receive federal funding.

21.    Title IX is enforceable through a private right of action.

22.    Collective Defendants, acting in concert with one another, violated Title IX through their actions and/or inactions in response to Plaintiff's complaint of sexual misconduct.

23.    Specifically, Plaintiff enrolled as a student at Defendant FCC in or around March of 2017.

24.    While enrolled as a student with Defendant FCC, Plaintiff took courses with Defendant Brookshire in order to earn her high school diploma as required for her chosen course of study.

25.    Shortly after enrolling in Defendant FCC, Advisor Davis was assigned to be Plaintiff's career advisor.

26.    As Plaintiff's career advisor, upon information and belief, Advisor Davis was tasked with helping guide Plaintiff academically while at Defendant FCC and to help assist her to obtain an externship during her enrollment, as well as employment for when she eventually graduated from Defendant FCC.

27.    Instead, Advisor Davis used his position of power over Plaintiff to blatantly abuse Ms. Malcolm's trust in him and soon began to sexually harass Plaintiff.

28.    Specifically, beginning in or around April of 2017, less than one month into Plaintiff's tenure at Defendant FCC, Advisor Davis began to subject Plaintiff to inappropriate comments and attention.

29.     Advisor Davis repeatedly called Ms. Malcolm "baby" and attempted to hold her hand, over her objections. Advisor Davis would ask Plaintiff out on dates and ask if she "wanted a real man", presumably referring to himself, rather than just "boys".

30.     Plaintiff was disgusted and humiliated by Advisor Davis' actions and repeatedly told asked him to stop, and told him to leave her alone. But Advisor Davis would not be stopped.

31.     The situation was even more precarious as Advisor Davis' role as Plaintiff's career advisor put him in a position of power over Plaintiff and her future career prospects.

32.     Beginning in or around May of 2017, Advisor Davis' comments became far more sexualized and pointed towards Plaintiff.

33.     By way of example only, on several occasions, when Advisor Davis noticed Plaintiff smoking a cigarette outside of Defendant FCC's building, Advisor Davis remarked to Plaintiff: "I have something you could put in your mouth and blow on."

34.     Upon information and belief, Advisor Davis was referring to the act of giving oral sex and was propositioning Plaintiff to give him a "blow job."

35.     By way of further example, on several occasions Advisor Davis approached Plaintiff while she was sitting down and sinisterly remarked, "I have something you can sit on."

36.     On one such occasion, Advisor Davis elaborated that he had a "pipe" for Plaintiff to seat herself on.

37.     Upon information and belief, Advisor Davis was again making a sexual reference to Plaintiff. Specifically, on the occasion Advisor Davis referred to a "pipe" for Plaintiff to sit on, upon information and belief, Advisor Davis was referring to his penis.

38.     Plaintiff was appalled at Advisor Davis' remarks and, often times, felt humiliated as he would make such comments in front of her friends and fellow students.

39.     Plaintiff did her best to try and ignore Advisor Davis and focus on her studies, but such was not an easy task. Plaintiff found herself increasingly more anxious to return to Defendant FCC for fear of having to interact with Advisor Davis again, which negatively impacted her focus on her academics.

40.     Meanwhile, Advisor Davis' behavior continued to worsen.

41.     Throughout Plaintiff's tenure at Defendant FCC, Advisor Davis, upon seeing Plaintiff, would often block her path and not remove himself unless Plaintiff hugged him.

42.     Plaintiff hated having to come into contact with Advisor Davis.

43.     In or around the early Summer of 2017, Plaintiff was mandated to take a CPR class taught by Advisor Davis. There were approximately 7 students in the class, including Plaintiff.

44.     During the class, Advisor Davis stated that he required the assistance of a student to demonstrate how to give CPR to a standing victim in distress.

45.     Upon information and belief, the technique being demonstrated required the person administering CPR to cross his/her/their hands *under* a victim's chest and administer compressions in an upward direction.

46.     Although she had not volunteered, and was actually attempting to avoid him as much as possible, Advisor Davis chose Plaintiff to help him in the live demonstration.

47.     Upon information and belief, Advisor Davis intentionally chose Plaintiff in order to further harass and get close to her.

48.     During the demonstration, Advisor Davis crept up behind Plaintiff and pushed the front side of his body against her backside. Advisor Davis was so close to Plaintiff that Ms. Malcolm could feel the outline of his genitalia against her.

49.     Thereafter, Advisor Davis wrapped his hands around Plaintiff's chest.

50.     Instead of crossing his arms around the underside of Plaintiff's chest, Advisor Davis instead wrapped his arms around the center of Ms. Malcolm's chest on top of her breasts. When he did so, Advisor Davis cupped and massaged Plaintiff's breasts.

51.     Plaintiff was mortified; she told Advisor Davis to "stop" and walked away from Advisor Davis but he would not be deterred.

52.     When Ms. Malcolm stepped away from him, Advisor Davis followed her and again pushed himself against her back and inappropriately grabbed at her body.

53.     Advisor Davis forced Ms. Malcolm to participate in this demonstration twice during the class, each time inappropriately rubbing himself against her and cupping her breasts.

54.     Upon information and belief, Advisor Davis viewed Plaintiff like a possession and intentionally kept tabs on where Plaintiff was.

55.     Advisor Davis frequently approached Ms. Malcolm's friends and fellow classmates during the school day to ask about Plaintiff's whereabouts.

56.     In or around September of 2017, Advisor Davis walked up to Plaintiff and, unsolicited, wrote his cellular phone number and work phone number in her schoolbook.

57.     Advisor Davis told Plaintiff to "use it" referring to his phone numbers. Plaintiff did not intend to ever call Advisor Davis and therefore, never did.

58.     As a consequence of Plaintiff's refusal to give into Advisor Davis' sexual advances and harassment, Advisor Davis lashed out at Ms. Malcolm and refused to assist her as her advisor.

59.     Whenever Plaintiff sought his professional help, Advisor Davis would refuse to give her any assistance with anything school or career related, and would tell Ms. Malcolm, "I'm still waiting on my call."

60.     On or about November 16, 2017, while Plaintiff was in Defendant FCC's career office with her friend, Advisor Davis spotted Ms. Malcolm place a piece of candy in her mouth. Upon seeing this, and in front of at least one witness, Advisor Davis brazenly walked up to Ms. Malcolm and told her "I have something you can suck on."

61.     Upon information and belief, Advisor Davis was again referring to the act of giving a 'blow job.'

62.     Plaintiff, embarrassed and feeling disrespected, broke down in tears.

63.     Advisor Davis' behavior was so obvious and terrible that Plaintiff's friend eventually stepped in on her behalf.

64.     In or around November of 2017, Plaintiff's friend and fellow student, "Nadia", reported Advisor Davis' sexually harassing behavior to a teacher, Dr. Sirus.

65.     After learning of Advisor Davis' behavior, Dr. Sirus accompanied Ms. Malcolm to Defendant FCC's President's office to formally lodge a complaint against Advisor Davis.

66.     Once the pair reached the President's office, Ms. Malcolm sat outside while Dr. Sirus addressed the President.

67.     Upon information and belief, Dr. Sirus advised the President about the complaint against Advisor Davis that had been brought to his attention by Nadia.

68.     Thereafter, the President invited Ms. Malcolm into his office to hear directly from her.

69.     At such time, Ms. Malcolm informed Defendant FCC's President of Advisor Davis' sexually harassing behavior, including and especially the incident where he saw her eat a piece of candy and remarked "I have something you can suck on."

70.     At the conclusion of the meeting, Defendant FCC's President advised Ms. Malcolm that Advisor Davis' behavior would not be tolerated at Defendant FCC and assured Plaintiff that the matter would be handled.

71.     After reporting Advisor Davis to Defendant FCC, Plaintiff was treated like an outcast by FCC's personnel, and blatantly retaliated against.

72.     By way of example, following her complaint, Plaintiff made numerous attempts to deduce the status of the investigation but was summarily dismissed and ignored by all of Defendant FCC's agents. Plaintiff was never told that an investigation was being started, nor was she put in contact with any member of Defendant FCC's staff to further discuss her claims against Advisor Davis.

73.     Eventually, Ms. Malcolm retained counsel who sent a letter to Defendant FCC advising them that he represented Ms. Malcolm in relation to her complaint against Advisor Davis and to ask what the status of the investigation was.

74.     Ms. Malcolm's counsel's correspondence was also ignored by Defendant FCC.

75.     Although Defendant FCC failed to answer Ms. Malcolm's and her counsel's inquiries, there is no doubt that such inquiries were received, as they were soon used against Plaintiff.

76.     Indeed, in a meeting with Defendant FCC's Head of the Medical Assistant department, Mr. Hill, Plaintiff was threatened for her complaints and her act of retaining counsel. Mr. Hill made it clear that he knew about Plaintiff's counsel's letter and threatened her ability to get a job through the school because of her counsel's communication.

77.     Thereafter, Defendant FCC intentionally made it extremely difficult for Plaintiff to secure a mandatory externship.

78.     Specifically, following her complaints against Advisor Davis, Defendant FCC told Plaintiff that she would be assigned a new career advisor.

79.     Notably, upon information and belief, there was no formal notice to Advisor Davis to stay away from or refrain from contact with Plaintiff following her complaint against him.

80.     It was crucial for Ms. Malcolm to have an effective career advisor as, at that time, she was preparing to find and secure an externship for over the winter.

81.     Instead of assigning Ms. Malcolm an effective career advisor, however, Defendant FCC played a game of 'ping-pong' with Plaintiff – bouncing her back and forth between career advisors, none of which were able or willing to effectively help her.

82.     By way of example, following her complaints against Advisor Davis, Plaintiff was told to work with career advisors Anissa Mills and Mr. Overstreet.

83.     Whenever Plaintiff would contact either Ms. Mills or Mr. Overstreet for assistance finding an externship, they would either respond that she should consult with the other advisor or someone else, or would ignore Ms. Malcolm's correspondence all together.

84.     Defendant FCC was so deficient in helping Ms. Malcolm find and secure an externship that eventually she had to find one through outside sources, namely through her friend, Nadia.

85.     Although Plaintiff continued to be enrolled as a student at Defendant FCC's facility, her final academic semester was spent in the field during her unpaid externship.

86.     Accordingly, Plaintiff's last day on-campus/in-class at Defendant FCC was on or about November 16, 2017.

87.     Throughout her externship, Plaintiff continued to be in contact with the revolving-door of career advisors Defendant FCC continued to assign her to. For the remainder of her time

as a student, Plaintiff was not reassigned to a singular, stable career advisor complicating the remainder of her enrollment with Defendant FCC exponentially.

88.     In or around late January 2018, during Plaintiff's self-secured externship and approximately three months after she submitted her verbal Title IX Complaint against Advisor Davis to Defendant FCC's President, Plaintiff was finally contacted by the Title IX Coordinator acting as Defendants' Title IX investigator.

89.     Upon information and belief, the Title IX Coordinator (who was also the Title IX investigator) was an employee of Defendant IEC.

90.     Plaintiff again told the investigator about Advisor Davis' sexually harassing behavior and provided the investigator with at least one witness to Advisor Davis' actions and comments - her friend, Nadia.

91.     Upon information and belief, the investigator spoke to Nadia who corroborated Plaintiff's story. Upon information and belief, Nadia confirmed that Advisor Davis would call Plaintiff "baby", would ask for her when she was not at school, and had said "I have something you can suck on" when he saw Plaintiff eating a piece of candy.

92.     Plaintiff was eager to hear back from the investigator and anxiously awaited any status updates from her. However, Plaintiff was not ever kept apprised of how the investigation was moving along.

93.     In or around January of 2018, Plaintiff was unfortunately involved in a car accident with her then infant child. As a result, Plaintiff was unable to continue to report to her usual externship site due to mobility and transportation problems and was forced to find a new site to report to, which Plaintiff did.

94.     Instead of assisting and supporting Ms. Malcolm through this difficult time, the College Defendants used this as an opportunity to lash out at Plaintiff and intentionally make things more difficult for her.

95.     Appallingly, following Ms. Malcolm's car accident, the College Defendants de-enrolled Plaintiff from the program *without* prior notice to her.

96.     On or about March 13, 2018, approximately four months after Plaintiff's Title IX complaint, Plaintiff received a letter from Defendant IEC's Title IX Coordinator.

97.     The letter read, in relevant part:

> Dear Ms. Malcolm:
>
> As required under [Title IX], [IEC] must investigate allegations of sexual harassment against a student. Based on these requirements, an investigation was initiated regarding [Advisor Davis]'s interactions with you during your enrollment at [Defendant FCC].
>
> …
>
> For the purpose of determining whether a particular course of conduct constitutes sexual harassment, the following definition was used:
>
> *Sexual Harassment: Any unwelcome sexual advance, request for sexual favors, or other unwelcome conduct of a sexual nature, whether verbal, physical, graphic, or otherwise. Specific examples of sexual harassment by an individual may include, but are not limited to, making written, verbal, physical, and/or visual contact of a sexual nature when the conduct or speech is so severe, persistent, or pervasive, and unwelcome as to undermine others' educational experienced and thus deny or limit equal access to [Defendant FCC] resources.*
>
> In evaluating allegations under Title IX, the "preponderance of the evidence" standard is used. Under this standard, individuals are presumed not to have engaged in the alleged conduct unless a "preponderance of the evidence" supports a finding that the conduct which constitutes a policy violation was more likely than not to have occurred. In complaints of sexual harassment, this also includes determining whether it was more likely than not, based on the

evidence and information available, that the alleged conduct was 1) of a sexual nature and 2) was so severe, persistent, or pervasive and unwelcome as to create a hostile environment that would deny or limit a student's access to the school's resources.

The investigation into the allegations of sexual harassment has concluded. Based on this information and evidence made available during the investigation, the Title IX Compliance Team was not able to determine that the reported conduct by [Advisor] Davis occurred.

98. In essence, despite Plaintiff's report and Plaintiff's witness corroborating the alleged sexual harassment, Defendant IEC cleared Advisor Davis of any wrongdoing.

99. Notably, although the letter alludes to evidence and information gathered during the investigation, Plaintiff was never provided a copy of such evidence.

100. Moreover, Plaintiff was never apprised of who comprised the "Title IX Compliance Team" referred to in Defendant IEC's letter.

101. Thus, without any apparent grounds or justification, the College Defendants dismissed Plaintiff's Title IX complaint and exonerated Advisor Davis of any and all wrong-doing.

102. The College Defendants' actions and/or inactions constitute deliberate indifference as their inadequate investigation and remedies to Plaintiff's complaint were clearly unreasonable in light of the known circumstances, including the gravity of the allegations and the severity and pervasiveness of the alleged misconduct.

103. As a direct and proximate result of the College Defendants' deliberate indifference to Plaintiff's complaint of sexual misconduct in violation of Title IX, Plaintiff was subjected to a hostile educational environment.

104. As a direct and proximate result of the College Defendants' deliberate indifference to Plaintiff's complaints of sexual misconduct in violation of Title IX, Plaintiff was deprived of her access to educational opportunities.

105.    As a direct and proximate result of the College Defendants' deliberate indifference to Plaintiff's complaints of sexual misconduct in violation of Title IX, Plaintiff has suffered and continues to suffer significant, severe, and ongoing emotional distress and mental anguish.

106.    In light of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and career opportunities, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### CLAIM II – Violation of Title IX of the Education Amendments of 1972
### Retaliation
### As Against the Collective Defendants

107.    Plaintiff repeats and re-alleges paragraphs 1 through 9, 12 through 15, and 23 through 101 as if fully set forth herein.

108.    Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

109.    Pursuant to Title IX, a funding recipient may not retaliate against a person who speaks out against gender discrimination and/or sexual harassment and/or sexual assault.

110.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding.

111.    Title IX applies to an entire school or institution if any part of that school receives federal funds even where there is very little direct federal funding of a particular department or academic and/or extracurricular area.

112.    As a student, Plaintiff experienced sexual harassment and at least one assault on her body by her career advisor, Advisor Davis.

113.    Plaintiff reported Advisor Davis' sexual misconduct to Defendant FCC's president.

114.    As set forth in detail above and herein, instead of appropriately addressing Plaintiff's complaints, the Collective Defendants retaliated against Plaintiff.

115.    Specifically, during the supposed investigation into Plaintiff's complaint of sexual misconduct against Advisor Davis, Defendant FCC stripped Plaintiff of access to an effective career advisor thus hindering Plaintiff's ability to find work and an externship vital to the continuation of her enrollment in Defendant FCC's program, and de-enrolled her without notice from the program. By doing so, Defendant FCC deprived Plaintiff of the resources and opportunities which were meant to be available to Plaintiff as a student of Defendant FCC.

116.    Moreover, following the exoneration of Advisor Davis, the Collective Defendants continued to retaliate against Plaintiff causing her significant harm academically, personally, and professionally.

117.    Specifically, despite finishing the program and ostensibly graduating and earning her degree with Defendant Brookshire, the Collective Defendants actively worked together to estop Plaintiff from being able to work in her chosen field.

118.    By way of example only, Plaintiff contacted Defendant Brookshire multiple times to obtain a copy of her diploma, transcripts, and other materials necessary to sit for her examination to obtain her medical assistant certification.

119.    However, despite knowing that Plaintiff needed such vital materials to obtain her certification, Defendant Brookshire steadfastly refused to provide same to Plaintiff. When pressed

for an explanation why, Defendant Brookshire informed Ms. Malcolm that it knew she had obtained counsel and therefore, would not speak to or assist her in any way.

120.   Moreover, the College Defendants also refused to provide Plaintiff with her own student records from Defendant FCC, records which were necessary for Plaintiff to produce in order to obtain her certification as a medical assistant.

121.   Again, when asked why she was being refused a copy of her own records, the College Defendants advised it was because she had the audacity to obtain counsel to assert her rights under Title IX.

122.   The Collective Defendants knew and/or should reasonably have known that withholding of the documents and records repeatedly requested by Ms. Malcolm would cause damage to her ability to practice as a medical assistant and thus intentionally barred Ms. Malcolm from being able to have a career in her chosen field.

123.   As a direct and proximate result of the Collective Defendants' retaliatory actions against Plaintiff following her complaint of sexual misconduct, Plaintiff was deprived of her access to educational and professional opportunities.

124.   As a direct and proximate result of the Collective Defendants' retaliatory actions against Plaintiff following her complaint of sexual misconduct, Plaintiff has suffered and continues to suffer significant, severe, and ongoing emotional distress and mental anguish.

125.   In light of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and career opportunities, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## CLAIM III – Breach of Implied and/or Express Contract
## As Against the College Defendants

126.    Plaintiff repeats and re-alleges paragraphs 1 through 9, 12 through 15, 23 through 101, and 115 through 122 as if fully set forth herein.

127.    Under Florida law, "the legal relationship between a [] university and a student" is contractual in nature. *See Sirpal v. Univ. of Miami*, 509 F.App'x 924, 929 (11th Cir. 2013). The terms of that contractual relationship "may be derived from [the institution's] publications" such as a handbook, catalog, or other policies. *See Gibson v. Lynn Univ., Inc.*, 2020 WL 7024463, at *2 (S.D. Fl. Nov. 29, 2020).

128.    Plaintiff was accepted as a student by the Collective Defendants in or around March of 2017.

129.    By enrolling as a student, Plaintiff and the Collective Defendants entered into a binding contract for in-person education. The terms and conditions of that contract were set forth in the College Defendants' policies and procedures.

130.    As a student, Plaintiff experienced sexual harassment and at least one assault on her body by her career advisor, Advisor Davis.

131.    Plaintiff reported Advisor Davis' sexual misconduct to Defendant FCC's president.

132.    Upon information and belief, at the time of Plaintiff's complaint against Advisor Davis, Defendant FCC published and maintained a Catalog which included a Statement of Non-Discrimination (the "Statement") and a Title IX Complaint/Grievance Procedure Policy (the "Procedure Policy").

133.    The Statement provided, in relevant part[1]:

> Florida Career College does not discriminate on the basis of race, color, religion, national or ethnic origin, sex, sexual orientation, gender identity or status, marital, parental, familial, veteran or military service status, age, or disability in its programs and activities. Florida Career College complies with all local, state, and federal laws barring discrimination.

134.    Furthermore, the Procedure Policy provided, in relevant part:

> In accordance with its Statement of Nondiscrimination and Title IX of the Education Amendments of 1972, Florida Career College's policy is to maintain an environment for students, staff, and third parties that is free of all forms of sex discrimination and harassment. [Defendant] FCC is committed to providing a prompt and equitable response to all Title IX related Complaints. [Defendant] FCC will take all steps necessary to eliminate the sex discrimination/harassment, to prevent its recurrence, and eliminate its effects.
>  …
>
> FCC prohibits all forms of sexual or gender-based discrimination, harassment, and misconduct, including sexual assault, non-consensual sexual contact, intimate partner violence, sexual exploitation, and stalking. FCC also prohibits retaliation against a person who reports, complains about, or who otherwise participates in good faith in any matter related to the [Policy].

135.    The Procedure Policy applies to instances and complaints of sexual harassment

which is defined as,

> Any unwelcome sexual advance, request for sexual favors, or other unwelcome conduct of a sexual nature, whether verbal, physical, graphic, or otherwise. Specific examples of sexual harassment by an individual may include, but are not limited to, making written, verbal, physical, and/or visual contact of a sexual nature when the conduct or speech is so severe, persistent, or pervasive, and unwelcome as to undermine others' educational experienced and thus deny or limit equal access to [Defendant] FCC resources.

---

[1] Plaintiff notes that the following provisions were taken from the 2019 Florida Career College School Catalog. Upon information and belief, Defendant FCC's 2017-2018 Cataloged mirrored the provisions in Defendant FCC's 2019 Catalog.

136.    With respect to reporting sexual misconduct and sexual harassment, the Procedure Policy "recommends that all individuals to report *[sic]* [such conduct] orally or in writing to the Title IX Coordinator" at Defendant IEC and provided the Title IX Coordinator's contact information. Curiously, however, the Title IX Coordinator's name was withheld in the Procedure Policy.

137.    In addition, the Title IX Coordinator also acted as Defendant IEC's Director of Human Resources.

138.    In addition, the Procedure Policy advised that "students may also notify the Campus President/Executive Director, Campus Security Authority, or any other FCC employee" of any incident of sexual misconduct or sexual harassment.

139.    Despite being notified that complaints could be made to various agents of Defendant FCC, the Statement provided that the Title IX Coordinator "has primary responsibility for coordinating [Defendant] FCC's efforts to handle inquiries regarding Title IX related complaints" and the Procedure Policy provided that the Title IX Coordinator "has primary responsibility for coordinating resolution of all reports of [sexual misconduct and sexual harassment."

140.    Once a complaint was received, the Title IX Coordinator "has an obligation to review the available information and determine whether to proceed to an investigation."

141.    Thus, as per the Procedure Policy, not all complaints of sexual misconduct or harassment are investigated, and Defendant FCC investigated "only those concerns raised in which the Title IX Coordinator determines that the allegations are plausible under the totality of the circumstances…".

142.     Moreover, it was within Defendant FCC's authority to institute interim measures to protect a complainant after receipt of a Title IX complaint. Such measures were "designed to eliminate the alleged discrimination/harassment and protect the parties involved."

143.     Moreover, the Procedure Policy provided that "[Defendant] FCC will make reasonable efforts to communicate with the parties to ensure that all safety, emotional and physical well-being concerns are being addressed.

144.     With respect to the investigation, the Procedure Policy provided that the Title IX Coordinator "will assign a Title IX Compliance Team Member to be the primary investigator for the matter." The Title IX Compliance Team consisted of the Campus President/Executive Director or designee at the campus, the Director of Employee Relations, and the Regional Vice President of Operations, where applicable.

145.     Moreover, "[i]n some circumstances, the primary investigator may be the Title IX Coordinator" him or herself.

146.     Accordingly, by the College Defendants' own policies and procedures, the College Defendants do not assign an objective and independent third-party individual to investigate claims of sexual assault, misconduct, or harassment on campus.

147.     Regardless of who is assigned to any individual case, "the primary investigator shall inform the complainant at regular intervals regarding the status of the investigation" and shall strive to investigate and resolve any complaint "promptly and effectively" after it is submitted.

148.     Once an investigation has been completed, Defendant FCC does not allow private hearings or adjudications. Rather, after the conclusion of an investigation, "the primary investigator shall promptly provide written notice of the outcome of the complaint to the complainant and respondent" and any necessary disciplinary action shall be issued.

149.    Plaintiff at all times was expected to adhere to Defendant FCC's internal policies and procedures, including, but not limited to, the Statement and the Procedure Policy, and at all times did so adhere to such policies and procedures.

150.    During the Title IX process and investigation into Plaintiff's complaint of sexual misconduct against Advisor Davis, the College Defendants intentionally and repeatedly failed to abide by the Statement and/or the Procedure Policy to the direct detriment of Plaintiff, thus causing Plaintiff significant damages.

151.    Based on the foregoing facts and circumstances, the College Defendants breached their express and/or implied agreement(s) with Plaintiff and are liable to Plaintiff for damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## DEMAND FOR JURY TRIAL

152.    Pursuant to Fed. R. Civ. P. 38, Plaintiff hereby demands a trial by jury on all claims/issues.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff seeks a judgment against the Collective Defendants as follows:

(i)    An Order enjoining the Collective Defendants, along with their agents, employees, and those acting in concert therewith, from unlawful discrimination on the basis of sex, including the failure to address, prevent and/or remedy sexual harassment;

(ii)    An award of damages against the Collective Defendants on Plaintiff's claims one through three, as outlined above, including, without limitation, reimbursement of and prepayment for all of Plaintiff's tuition or related expenses; payment of Plaintiff's expenses incurred as a consequence of the within alleged actions; damages for deprivations of the equal access to the education benefits and opportunities provided by the Collective Defendants; and damages for past, present, and future emotional pain and suffering, ongoing and severe mental

anguish, and loss of past, present, and future earnings and enjoyment of life in an amount to be determined at trial;

(iii)   Punitive and/or exemplary damages against the Collective Defendants, where available;

(iv)   Statutory pre- and post-judgment interest on all sums awarded;

(v)   An award of costs and attorneys' fees; and

(vi)   Any other relief the Court finds just and proper.

**Dated: March 10, 2021**

Respectfully submitted,

**STEPHEN E. BAILEY, P.A.**
*Attorneys for Plaintiff*

**By: _/s/ Jared Bailey_____**
**Jared Bailey, Esq.**
**9008 Seminole Boulevard**
**Seminole, Florida 33772**
**(727) 319-6430**

**-and-**

**NESENOFF & MILTENBERG, LLP**
*Attorneys for Plaintiff*

**By: _/s/ Andrew Miltenberg_____**
**Andrew Miltenberg, Esq. (*pro hac vice pending*)**
**Gabrielle Vinci, Esq. (*pro hac vice pending*)**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**